<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DERMOT DESMOND<br><br>Plaintiff,<br><br>v.<br><br>PAUL ELI SIEGEL and GLOBECON<br>GROUP HOLDINGS, L.C.C. a/k/a<br>"Starweaver"<br><br>Defendants. | Civ. No. 10-5562  (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

COOPER LEVENSON APRIL NIEDELMAN & WAGENHEIM, P.A.
by: William J. Hughes, Jr., Esq.
     Mark A. Fiore, Esq.
1125 Atlantic Avenue
Atlantic City, New Jersey 08401

SULLIVAN & WORCESTER LLP
by: Barry S. Pollack, Esq.
     Joshua L. Solomon, Esq.
One Post Office Square
Boston, MA 02109

         *Attorneys for Plaintiff,*

MCCUSKER, ANSELMI, ROSEN & CARVELLI, P.C.
by: Bruce S. Rosen, Esq.
     Kathleen A. Hirce, Esq.
210 Park Avenue, Suite 301
Florham Park, New Jersey 07928

*Attorneys for Defendants.*

**DEBEVOISE, Senior District Judge**

This matter arises out of a fictitious and crude website about a well-known Irish entrepreneur.  On October 27, 2010, Plaintiff Dermot Desmond filed a Complaint against Defendants Paul Siegel and Globecon Group Holdings, L.L.C.[1] setting forth claims of defamation, defamation per se, false light, and intentional infliction of emotional distress, and seeking compensatory and punitive damages and injunctive relief.

On June 8, 2011, Mr. Desmond filed a Motion to Amend the Complaint, along with a proposed Amended Complaint adding claims of harassment under N.J.S.A. 2C:33-4, impersonation under N.J.S.A. 2C:21-17(a)(4), New Jersey RICO, N.J.S.A. 2C:41-1 et seq., and Federal RICO, 18 U.S.C. § 1961 et seq., and seeking injunctive relief, restitution, and punitive and treble damages.  Defendants opposed the motion.  On January 31, 2012, Magistrate Judge Shipp filed a Letter Opinion and Order granting Mr. Desmond's Motion to Amend the Complaint.

Defendants now appeal Judge Shipp's January 31, 2012 Order.  For the reasons set forth below, that Order is AFFIRMED.

## I.  BACKGROUND

In 1990, Mr. Siegel was employed at a company called Daiwa Securities ("Daiwa"). After a mere seven months at Daiwa, Mr. Siegel was terminated "for misconduct."  (Amend. Compl. ¶ 13.)  Specifically, on January 25, 1990, "Mr. Siegel caused a letter to be sent to" Edward J. Hammel, an employee of one of Daiwa's potential clients, "filled with false material statements concerning the status of [a] potential engagement."  (Id. ¶ 14.)  Mr. Siegel "then

---

[1] Mr. Desmond also sued GoDaddy.com, Inc., but subsequently dismissed its claims against GoDaddy voluntarily.

embarked on a campaign of contacting more than twenty people and entities in an effort to cause the failure of the pertinent transaction on which Mr. Hammel was working."  (Id.)

On November 9, 1992, Mr. Siegel formed a corporation called International Development Partners ("IDP").  In June 1993, Mr. Siegel "materially misrepresented to Thomas Lipcomb and Alan Alpern of Infosafe Systems, Inc. ('Infosafe') that: (a) he had relationships of confidence with significant venture fund managers; (b) he had a significant following of individual clients who could assist him in raising capital for Infosafe; (c) he had recently effected a $25,000,000 transaction in connection with a merger involving a publicly owned finance company; (d) that prior clients owed him and had already agreed to provide a minimum of $500,000 for his next financing proposal; (e) he would prefer to make the investment himself on a loan he would take; and (f) he was in continuous contact with numerous principals and managers of financial institutions that provided venture capital for new technology firms."  (Id. ¶ 16.)  Then, in June 1994, Mr. Siegel contacted Robert Nagel and Charlton H. Calhoun of Infosafe "for the purpose of harassing them and extorting concessions by Infosafe through threats that otherwise Infosafe was 'history' and would 'go down the drain.'"  (Id. ¶ 17.)

On May 10, 1995, "an entity known as "Emergency Medical Systems, Inc. ("EMS") was formed in Delaware."  (Id. ¶ 18.)  EMS's registration in New York identified Mr. Siegel as the company's president.  On January 18, 1997, Mr. Siegel changed the company's name to MediVault, Inc.  At one point, Mr. Siegel terminated David Hirsch's employment at MediVault and "sent a threatening letter" to him "attempting to extort him into relinquishing his rights." (Id. ¶ 20.)  In addition, Mr. Siegel "seized and reassigned to another employee an automobile that had been leased to Mr. Hirsch."  (Id.)  On August 13, 1998, Mr. Siegel "utilized bankruptcy

proceedings to purchase MediVault's assets for himself . . . while avoiding its liabilities." (Id. ¶ 20.)

IDP was later restructured and, on September 9, 1999, changed its name to Starweaver, LLC. On August 7, 2000, Mr. Siegel registered Starweaver in New Jersey and identified himself as the company's Managing Partner and CEO. On March 12, 2001, Mr. Siegel registered Globecon in New York to "continue his 'Starweaver' operations."[2] (Id. ¶ 23.) Globecon is a company that "provide[s] professional development services for corporate and investment banking customers." (Id. ¶ 7.) The Amended Complaint sets forth several unsavory acts committed by Mr. Siegel through Globecon.

**A.   Inflated Insurance Claims and Default on Promissory Note Arising out of 9/11 Attacks**

Through Globecon, Mr. Siegel purchased a number of insurance claims held by The Globecon Group Ltd. ("Old Globecon"), a bankrupt entity, against Hartford Financial Services Group ("Hartford") for "for the purported disruption" of Old Globecon's business operations arising out of the World Trade Center attacks of September 11, 2001. (Id. ¶ 24.) "Prior to the acquisition of these assets out of bankruptcy proceedings," Mr. Siegel knew that Old Globecon had suffered "minimal damage" as a result of the attacks and in fact "had suffered financial difficulties in the dot-com industry and faced insolvency before the events of September 11, 2001." (Id.)

Moreover, after acquiring Old Globecon's claims, Gerald Kramer, Old Globecon's former principal shareholder, told Mr. Siegel that Old Globecon's "insurance claims were worth only nominal amounts." (Id. ¶ 25.) However, Mr. Siegel submitted a vastly inflated insurance

---

[2] According to the Amended Complaint, "Starweaver has held itself out, under the control of Siegel and Globecon, as a 'family' of funds and 'group' of associated professionals that have engaged in activities for which Siegel and Globecon have taken credit." (Amend. Compl. ¶ 7.)

claim for $6.5 million, "of which $5.7 million was purportedly for business interruption and lost business that never occurred."  (Id. ¶ 26.)  When Hartford denied the claim, Mr. Siegel and a Globecon affiliate "filed fraudulent and frivolous litigation seeking purported damages to property, business income losses, and other losses in excess of $1,879,017."  (Id.)

On December 22, 2003, Mr. Siegel and a Globecon affiliate "signed a promissory note acknowledging receipt of $100,000 from the Structured Employment Economic Development Corporation ("SEEDCO") in connection with the Lower Manhattan Small Business and Workforce Retention Project."  (Id. ¶ 27.)  According to the Amended Complaint, Mr. Siegel and Globecon never intended to perform under the note and consequently defaulted on it.

**B.      Use of Forged Signatures in Litigation**

In April 2007, Mr. Siegel and Globecon "utilized a forged signature of a former employee, David Askin, to defend against litigation brought by him in the Supreme Court of the State of New York, New York County."  (Id. ¶ 28.)  Specifically, the Amended Complaint alleges that Mr. Siegel used a "facsimile cut-and-paste of Mr. Askin's signature on a document purportedly dated March 24, 2003" stating that he agreed to forego salary payments, although he neither signed any such document nor agreed to any such terms.  (Id.)  In doing so, Mr. Siegel "utilized a 'Microsoft Paint' graphics software program on [his] computer to manipulate an electronic graphics image of Mr. Askin's signature."[3]  (Id.)

One month earlier, Mr. Siegel, though a Globecon affiliate, initiated a lawsuit against Norman Joyce, a former Globecon employee, "who had witnessed Siegel's forgery of Mr. Askin's signature and who provided Mr. Askin with evidence to that effect."  (Id. ¶ 29.)  According to the Amended Complaint, Mr. Siegel "forged the initials of Mr. Joyce on a

---

[3] In addition, Mr. Siegel "sought to enlist one of [Globecon's] employees to help backdate an email from Mr. Askin to facilitate forgery efforts."  (Amend. Compl. ¶ 28.)

purported attachment to a 2005 confidentiality agreement" to show that Mr. Joyce breached the terms of a restrictive covenant after leaving Globecon to work at Terrapin Financial Trading, which Mr. Siegel contended was a Globecon competitor.  (Id.)  Mr. Joyce never signed any such document.  The Amended Complaint further alleges that Mr. Siegel thwarted business opportunities between Mr. Joyce and an entity known as "7city" by "plac[ing] several telephone calls and sen[ding] several threatening emails to 7city" claiming that "Mr. Joyce was bound to the forged restrictive covenant."  (Id. ¶ 30.)

On April 9, 2007, in a third litigation, Mr. Siegel allegedly "used and relied on a forged signature of Patrick Pancoast on a restrictive covenant agreement that Mr. Pancoast in fact did not sign . . . to facilitate demands for payment from Mr. Pantcoast's subsequent employer and later from" Mr. Desmond.  (Id. ¶ 31.)

C.     **Impersonation of Others**

In December 2009, Mr. Siegel and Globecon created fake email addresses for Fernando Botargues and Kenneth Loso—two individual to whom Mr. Siegel and Globecon owed money— and fake websites for Mr. Botargues, Mr. Loso, and their business entities that provided links to pornographic material.  These websites "referred to Mr. Botargues as a 'sickening a--hole, the 'biggest world class a--hole,' an 'incontinent gay Chihuahua that sh--on your carpet and can't be trained to do otherwise.'"  (Id. ¶ 32.)

D.     **Obstruction of Justice**

On August 21, 2008, Mr. Siegel and Globecon "filed a petition in the United States Tax Court in which he originally blamed Globecon's former bookkeeper for having failed to file its taxes."  (Id. ¶ 33.)  In connection with Globecon's failure to file its taxes, Mr. Siegel "lodged

various complaints against IRS Agent Reubel, including assertions that Agent Reubel was acting out of personal animus and was not qualified to handle the case."  (Id.)

Shortly before a trial on the matter, Mr. Siegel faxed to the IRS a signed stipulation to the IRS's determination of the amount that Globecon owed in taxes, but "intentionally delayed final resolution of the proceedings by failing to return the original copy of the stipulation as he was supposed to do" and "thereafter remained unresponsive."  (Id.)

## E.    Dealings with Mr. Desmond

### i.    Attempted Extortion of Mr. Desmond

On June 15, 2010, Mr. Siegel, through Globecon, sent a letter to Mr. Desmond, via fax, from New Jersey to Ireland, stating that one of Mr. Desmond's companies, Intuition Publishing, "has perpetrated a multimillion dollar theft and is now illegally using [Globecon's] company's intellectual property."  (Rosen Cert., Ex. C.)  The letter referred to "many undisputed facts" to support this claim.  (Id.)  The letter goes on to say that "while I am not a speck as successful or powerful as you, I wager I am certainly one of the most tenacious people you would ever meet. Thus, my character requires me to achieve a just resolution on my own terms if I do not hear from you further."  (Id.)  The letter seeks to "resolve . . . [the] unfortunate situation[] in a reasonable manner," but notes that "immoral and unethical business practice will logically lead to ruin," and that "that is not something that you are I desire regardless of the potential reward." (Id.)

On June 18, 2010, Mr. Desmond sent a letter to Mr. Siegel in response to the June 15, 2010 letter.  See (Rosen Cert., Ex. D.)  Mr. Desmond's letter stated the following:

> Your allegations are wholly defamatory and unfounded and have been previously dismissed in court.  Our investigations show you have extorted money from a long list of victims, employees, creditors and the local and Federal Government.  Nothing you say is credible in any forum.

> If you repeat any of the allegations in your fax I will sue you personally and see that the full range of your criminal activities are exposed.  You will then understand the meaning of the word tenacity.

(Id.)

On June 23, 2010—apparently before receiving Mr. Desmond's June 18, 2010 letter—Mr. Siegel sent a second letter to Mr. Desmond, via fax, offering "additional factual data" in support of his claim that Intuition stole Globecon's intellectual property.[4]  (Rosen Cert., Ex. E.)  Mr. Siegel concluded the letter by saying that he "look[ed] forward to a fair commercial arrangement to resolve this matter."  (Id.)

On July 2, 2010, Mr. Siegel sent a third letter to Mr. Desmond, via fax, calling Mr. Desmond's June 18, 2010 letter "outrageous and defamatory" and "demonstrate[ing] a weakness of personality and character."  (Rosen Cert., Ex. F.)  The letter maintains that the tone of Mr. Desmond's letter "is exactly that of [the] rapist who blames the rape victim for the rape" and states that "when the facts of your financial rape and copyright theft are in the open there will be little denying it . . . light will truly be the best disinfectant."  (Id.)  The letter concludes by stating that "[i]f you cannot gather the courage to act like a man then you will do as you want, as will we."  (Id.)  According to the Amended Complaint, this language "expressly and impliedly indicated that [Mr. Siegel and Globecon] would subject [Mr. Siegel] to public assertions of 'financial rape,' 'theft,' and the like, as well as other firms of public ridicule."  (Amend. Compl. ¶ 37.)

### ii.    *meetdermotdesmond.com*

---

[4] The letter offered a list of certain of Globecon's "registered copyright content" for Mr. Desmond to view from a secure online location.  (Rosen Cert., Ex. E.)

On October 16, 2010, Mr. Siegel and Globecon anonymously[5] launched the website meetdermotdesmond.com, which contains "numerous harassing and abusive statements."[6] (Id. ¶ 42.)  Shortly after it was clear that the site was attributable to them, see Note 5, "Siegel and Globecon made several of the internal links of the meetdermondesmond.com website accessible only by use of a password."  (Amend. Compl. ¶ 41.)  However, the homepage that was still available to any internet user "contain[d] a heading of 'Tax Evasion'" and displayed a picture of Mr. Desmond and a business associate playing golf "bearing the caption 'pickpocket,'" going onto state that "'if you play golf with Dermot, as our unwitting dupe in the blue at the right did, you better check your pockets closely' and '[a]s a punter in his heart, Wee Dermot grew to a man and learned ''don't pay for anything you can get by pinching someone's pocket.''  So pinch he did."[7]  (Id. ¶¶ 45(a), (b).)  The homepage also stated that "'public ridicule' was good for [Mr. Desmond] because his 'chromosomes and breeding may drive' him 'in the exact opposite direction' of being 'legal.'"  (Id.)

The internal links that Mr. Siegel and Globecon made password protected[8] contained "harassing and abusive statements" (id. ¶ 41), including accusations that Mr. Desmond

---

[5] They were able to "hide their identities by using the proxy service Domains by Proxy, Inc. ('DBP'), an Arizona-based proxy service that masks the identity of the registrant of an Internet domain name."  (Amend. Compl. ¶ 40.)  On October 25, 2010, "DBP canceled their privacy for the meetdermotdesmond.com internet domain, which allowed [Mr. Desmond] to identify Siegel and Globecon as responsible for the content on that website."  (Id.)

[6] In addition to this website, Mr. Siegel and Globecon "illegally impersonated [Mr. Desmond] by registering an email address with his name, 'Dermot Desmond' displayed for an email address of dermotdesmond666@gmail.com, and using it to send out offensive messages utilizing coarse language."  (Amend. Comp. ¶ 45(i).)

[7] Another area of the site "repeats this allegation of thievery."  (Amend. Compl. ¶ 45(a).)

[8] To be sure, Mr. Siegel could at any time lift the password protected areas of meetdermondesmond.com and make them available to all visitors to the site.

committed crimes and associated with criminals and child molesters, and attacks on his family along with links to sexually explicit content.  The site also "falsely impersonates" Mr. Desmond by making "many of the statements on it falsely purport to be [his] own words" and linking to a blog "that [Mr. Desmond] supposedly authored (but did not)."[9]  (Id. ¶ 43.)

The site also (1) refers to Mr. Desmond as "a rapist" and encourages visitors to "'[c]ontact my hardened criminal friends' who are stated to be 'hardened criminals, murders, and pederasts'" (id. ¶ 45(c)); (2) lists Mr. Desmond's "'role models,' which include Oliver O'Grady (a former Catholic priest who allegedly 'raped molested and abused many children in California'), Colonel Thomas Blood (an alleged thief, would-be kidnapper and murderer) and 'Tiger' Roche (an alleged thief and murderer)" (id. ¶ 45(d)); (3) accuses Mr. Desmond of sodomy and quotes "his 'closest friend'" as saying: "'Once a bugger, always a bugger-er'" (id. ¶ 45(e)); (4) portrays Mr. Desmond as saying "'[m]y grandmother's teeth were as tight as the cheeks on this fellow's butt'" and provides a link "to an unknown user's Facebook page, showing a photograph of a man exposing his naked buttocks" (id. ¶ 45(f)); and (5) state that Mr. Desmond is "'London City's Biggest Crook'"[10] (id. ¶ 48.)

Finally, the site contained a link to a page entitled "Contact Dermot."  That page lists Mr. Dermot's address, phone number, and business email, and states that, in exchange for money, Mr. Desmond "will buy members of the public an obscene tee-shirt" that "portray[s] . . . an Irish stereotype."  (Id. ¶ 45(h).)

**F.      Magistrate Judge Shipp's Opinion Granting Mr. Desmond's Motion to Amend**

---

[9] The blog, entitled "Dermot's Blog," contained a number of "untruthful and defamatory statements" in a section called "Timeline of a Crime."  (Amend. Compl. ¶ 45(g).)

[10] This section, among others, contains the statement "Facts and Figures to be added soon," suggesting that Mr. Siegel and Globecon planned to add further defamatory content to the site.  (Amend. Compl. ¶ 48.)

Based on the aforementioned allegations, Judge Shipp granted Mr. Desmond's Motion to Amend the Complaint to add claims for harassment and impersonation under federal and New Jersey law, as well as federal and New Jersey RICO claims.  In doing so, Judge Shipp noted that while Mr. Desmond's "factual allegations" in support of his RICO claims "are [not] particularly strong," in light of RICO's "exceptionally broad' reach and the Third Circuit's 'particularly liberal approach in favor of permitting pleading amendments,'" Mr. Desmond's RICO claims are "sufficiently well-grounded" to be deemed "not a frivolous pursuit."  (Opinion, January 31, 2012, [ECF No. 70], 6-7.)

## II.  DISCUSSION

Defendants now appeal Judge Shipp's Order granting Mr. Desmond's Motion to Amend the Complaint to add federal and New Jersey RICO claims.  In doing so, they argue that Mr. Desmond (1) lacks RICO standing; (2) fails to plead a RICO enterprise; and (3) fails to plead a pattern of racketeering activity.[11]

**A.      Standard of Review**

A Magistrate Judge's decision is to be overturned only to the extent that the ruling is "clearly erroneous or contrary to law."  L.Civ.R.72.1(c)(1)(A).  The burden of showing that a ruling is "clearly erroneous or contrary to law rests with the party filing the appeal."  Marks v. Struble, 347 F. Supp. 2d 136, 149 (D.N.J. 2004).  A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 131 F.R.D. 63, 65 (D.N.J. 1990) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  "A ruling is contrary to law if the magistrate judge has

---

[11] Defendants also argue that, to the extent the Court reverses Judge Shipp's January 31, 2012 Order, it should strike any reference to Defendants' "Criminal Acts" as scandalous and immaterial.

misinterpreted or misapplied applicable law." Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau Co., Inc. 106 F.Supp.2d 761, 764 (D.N.J. 2000).

A Magistrate Judge's decision granting leave to amend a complaint is given a high level of deference, as "leave should be 'freely given when justice so requires.'" Winer Family Trust v. Queen, 503 F.3d 319, 330 (3d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). However, "a District Court may deny leave to amend on the grounds that amendment would cause undue delay or prejudice, or that amendment would be futile." Id. at 331-32 (quotation omitted). "[A]n amendment would be futile when the complaint, as amended, would fail to state a claim upon which relief could be granted." In re NAHC, Inc. Secs. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002) (quotation omitted). Accordingly, the allegations in the complaint must be enough to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "The District Court determines futility by taking all pleaded allegations as true and viewing them in a light most favorable to the plaintiff." Winer Family Trust, 503 F.3d at 331.

## B.    Mr. Desmond's RICO Claims

18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1964(c) provides a private right of action to those who are "injured in [their] business or property by reason of a violation of" 18 U.S.C. § 1962. "To plead a RICO claim under § 1962(c), the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 362 (3d Cir. 2010) (quotation and citation omitted). Similarly, "[t]he gravamen of a New Jersey Jersey RICO violation, frequently referred to as 'racketeering,'

is the involvement in the affairs of an enterprise through a pattern of racketeering activity." State v. Ball, 141 N.J. 142, 155 (1995).

Defendants argue that Mr. Desmond (1) lacks standing under the federal and New Jersey RICO statutes; (2) fails to plead a RICO enterprise; and (3) fails to plead a pattern of racketeering activity.  The Court will address each argument in turn.

### i.      RICO Standing

For a party to have standing to bring RICO claims under 18 U.S.C. § 1964(c), he must show that (1) he "suffered an injury to business or property"; and (2) his "injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962."  Maio v. Aetna, 221 F.3d 472, 483 (3d Cir. 2000) (citations omitted).  "[T]he injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss."  Id. (citations omitted).  Similarly, "[i]n order to establish standing to institute a civil action under NJRICO, it must be shown that plaintiff's harm was proximately caused by the NJRICO predicate acts alleged, i.e., that there was a direct relationship between plaintiff's injury and defendant's conduct."  Franklin Med. Assocs. v. Newark Public Schs., 362 N.J. Super. 494, 514 (App. Div. 2003) (quotation omitted).  "This requires a showing not only that the offender's alleged NJRICO violation was the 'but for' cause of the plaintiff's injury, but also that the violation was the proximate cause."  Id. (citation omitted).

The Amended Complaint alleges that, "[a]s a direct and proximate result of these racketeering activities by Siegel and Globecon, Plaintiff has suffered costs to remediate harm and attorneys' fees," and that he "suffered economic losses in the hundreds of thousands of dollars engaging in remedial action to investigate and block criminal conduct by Siegel and Globecon and to remove their illegal website."  (Amend. Compl. ¶¶ 51, 64, 69.)  Costs associated with

remediating or taking legal action against RICO conduct amount to an "out-of-pocket loss" that

is actionable under RICO.  See Weiss v. First Unum Life Ins. Co., 482 F.3d 254, 258 n. 2 (3d

Cir. 2007) (losses from sale of home and personal property to remediate harm and payment of

IRS fees and penalties arising from defendant's racketeering scheme involving illegal policy of

rejecting long-term disability benefits "were out-of-pocket expenses . . . and thus qualify as an

injury to property for RICO purposes."); Walter v. Palisades Collection, LLC, 480 F. Supp. 2d

797, 804 (E.D.Pa. 2007) ("[P]ayment of legal fees can be actionable injuries under RICO.");

Pappa v. Unum Life Ins. Co. of Am., 2008 WL 744820, at *9 (M.D.Pa. 2008) (payment of legal

fees is an injury "proper to a RICO claim.").  Indeed, as Mr. Desmond notes in his brief, "if a

RICO enterprise member threatened to shoot someone unless he paid monthly sums, the victim's

costs incurred for medical expenses or in hiring a bodyguard pose just as much of an out-of-

pocket loss as would paying the extorted sum."  (Pl. Br. 13-14.)

    The Amended Complaint also satisfies the but for and proximate cause elements of RICO

standing, as it makes clear that Mr. Desmond's remedial expenses arose out of Defendants'

attempted extortion and subsequent harassment campaign through meetdermotdesmond.com and

dermotdesmond666@gmail.com.  See Weiss, 482 F.3d at 258 n.2 (a plaintiff need show "out-of-

pocket expenses fairly traceable to [the defendant's] conduct" to satisfy the elements of RICO

standing).  Consequently, Mr. Desmond has satisfied the elements of federal and New Jersey

RICO standing.

    ### ii.    RICO Enterprise

    Under the federal RICO statute, an "enterprise" is "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity."  18 U.S.C. § 1961(4).  A RICO enterprise under the New Jersey

RICO statute is analyzed in the same manner as a federal RICO enterprise.  See Ball, 141 N.J. 156-161 (noting the New Jersey Supreme Court's "understanding of the term 'enterprise' is derived from the extensive legislative history and decisional law dealing with both the State and federal RICO statutes" and that a New Jersey RICO enterprise "is framed broadly to include any group of persons 'associated in fact.'").

The Supreme Court has made clear that (1) "an enterprise 'is an entity separate and apart from the pattern of activity in which it engages,'" Boyle v. United States, 556 U.S. 938, 954 (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)); and (2) that a RICO defendant must be a person that is legally distinct from the alleged RICO enterprise.  See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").

The Amended Complaint alleges that "Siegel, Globecon, Starweaver, [IDP,] and Medivault have been associated-in-fact in an enterprise (the 'Starweaver-Globecon Enterprise')." (Amend. Compl. ¶¶ 7, 67.)  "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."  Boyle, 556 U.S. at 948.  Accordingly, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[12]  Id. at 946.

---

[12] Such an enterprise "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc.  Members of the group need not have fixed roles; different members may perform different roles at different times.  The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies.  While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise

The Amended Complaint sets forth the features of an association-in-fact enterprise. Specifically, the allegation that Mr. Siegel and Globecon used the Starweaver-Globecon Enterprise "to gain unfair advantage over other parties" and avoid various business obligations through threats and intimidation, (Amend. Compl. ¶ 34), satisfies the purpose requirement. And the allegation that, since January 18, 1997, Mr. Siegel and Globecon "engaged in a pattern of unlawful conduct through a network of corporate entities that [Mr. Siegel] formed," (id. ¶¶ 11, 66), namely IDP, Starweaver, MediVault, and Globecon, satisfies the relationship and longevity requirements.[13]  This allegation also satisfies the separateness requirement between a RICO defendant and a RICO enterprise.  See Cedric Kushner Promotions, 533 U.S. at 163 (unanimous decision rejecting limitation that president and sole shareholder of a company is not distinct "person" from wholly-owned company "enterprise" because "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.  And we can find nothing in the statute that requires more 'separateness' than that.").  Thus, the Amended Complaint successfully pleads a RICO enterprise.

### iii.    *Pattern of Racketeering Activity*

---

whose associates engage in spurts of activity punctuated by periods of quiescence."  Boyle, 556 U.S. at 948.

[13] To be sure, the corporate entities that comprise the Starweaver-Globecon Enterprise did not all exist at the same time.  MediVault existed from 1997-1998, and IDP existed from 1992-1999, while Starweaver and Globecon were formed in 1999 and 2001, respectively.  However, there is no requirement that the "continuing unit" of a RICO enterprise maintain the same membership throughout its existence.  Indeed, the Supreme Court has recognized the flexibility and "breadth of the 'enterprise' concept in RICO."  Boyle, 556 U.S. at 949; see also United States v. Bergrin, 650 F.3d 257, 268 ("In numerous instances, the [Supreme] Court has been asked to impose limits on how RICO may be applied, and it has consistently declined to do so.").

Under federal RICO, "[r]acketeering activity" is "any act or threat involving" a variety of criminal activity, including extortion, mail fraud, and wire fraud, as the Amended Complaint alleges. 18 U.S.C. § 1961(1). "A 'pattern of racketeering activity' is defined as 'requir[ing] at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity.'" Bergrin, 650 F.3d at 266-67 (quoting 18 U.S.C. § 1961(5)). "It is the 'person' charged with the racketeering offense—not the entire enterprise—who must engage in the 'pattern of racketeering activity.'" Id. at 267 (citing H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 244 (1989)).

Similarly, under New Jersey RICO, "racketeering activity" includes a number of crimes alleged in the Amended Complaint under New Jersey law, such as extortion, forgery, and impersonation. N.J.S.A. 2C:41-1a. A "pattern of racketeering activity" requires (1) "[e]ngaging in at least two incidents of racketeering conduct . . . the last of which shall have occurred within 10 years . . . after a prior incident of racketeering activity;" and (2) "A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J.S.A. 2C:41-1d.

With respect to Mr. Desmond's federal RICO claim, the Amended Complaint alleges that Mr. Siegel engaged in "a pattern of racketeering activity that included, extortion, forgery and fraudulent practices" in violation of 18 U.S.C. §§ 1951 and 1952 (the Hobbs Act), N.J.S.A. 2C:20-5(c) (extortion), N.J.S.A. 2C:13-5 (criminal coercion), and 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), "having the same and similar purposes, results, and participants, and methods of commission otherwise interrelated, and otherwise constituting the enterprise's

regular way of doing business. . . ."  (Amend. Compl. ¶¶ 66, 67.)  With respect to Mr.
Desmond's New Jersey RICO claim, the Amended Complaint alleges that Mr. Siegel's and
"[t]he enterprise's pattern of unlawful conduct included extortion in violation of 18 U.S.C. §§
1951 & 1952 and N.J.S.A. 2C:13-5" and "knowingly, intentionally and willfully impersonated"
Mr. Desmond in violation of N.J.S.A. 2C:21-17(a)(4).  (Id. ¶ 62.)

Defendants argue that the Amended Complaint fails to establish (1) predicate acts of mail
fraud, wire fraud, extortion, or criminal coercion; and (2) a pattern of racketeering activity.

      a.  Predicate Acts

"The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires
for purposes of carrying out any scheme or artifice to defraud."  Lum v. Bank of America, 361
F.3d 217, 223 (3d Cir. 2004) (citing 18 U.S.C. §§ 1341 and 1343).  "A scheme or artifice to
defraud need not be fraudulent on its face, but must involve some sort of fraudulent
misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and
comprehension."  Id. (quotation omitted).

"Where . . . [a] plaintiff[] rel[ies] on mail and wire fraud as a basis for a RICO violation,
the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires
that allegations of fraud be pled with specificity."  Id. (citation omitted).  "In order to satisfy
Rule 9(b), plaintiffs must plead with particularity the 'circumstances' of the alleged fraud in
order to place the defendants on notice of the precise misconduct with which they are charged."
Id. at 223-24 (quotation omitted).  "Plaintiffs may satisfy this requirement by pleading the date,
place or time of the fraud, or through alternative means of injecting precision and some measure
of substantiation into their allegations of fraud."  Id. at 224 (citation omitted).  "Plaintiffs also

must allege who made a misrepresentation to whom and the general content of the misrepresentation." Id. (citation omitted).

The Amended Complaint sufficiently alleges three acts of mail fraud.[14] First, Mr. Siegel, through Globecon, purchased insurance claims from Old Globecon and submitted those claims to Hartford for an amount that Mr. Siegel knew was vastly inflated.[15] Second, in April 2007, Mr. Siegel, through Globecon, submitted a document in a litigation to the Supreme Court of the State of New York, dated March 24, 2003, that contained the forged signature—forged by Mr. Siegel by using Microsoft Paint graphics software—of David Askin, a former Globecon employee, as evidence that Mr. Askin agreed to forego salary payments, although he never agreed to do so. Third, in March 2007, Mr. Siegel forged the initials of Norman Joyce, another former Globecon employee, on a document and submitted it in a litigation in the Supreme Court of the State of New York to show that Mr. Joyce breached the terms of a restrictive covenant after leaving Globecon to work for another company, even though Mr. Joyce never signed any such restrictive covenant.

The Amended Complaint also sets forth acts of attempted extortion committed by Mr. Siegel against Mr. Desmond in violation of the Hobbs Act.[16] To establish a violation of the

---

[14] To be sure, the Amended Complaint sets forth allegations of other acts of mail and wire fraud; however, those allegations are not sufficiently detailed to satisfy Rule 9(b).

[15] While the Amended Complaint fails to note the specific date of the submission of the fraudulent claim via interstate mail, it nonetheless sets forth other particular circumstances surrounding the fraud in order to satisfy Rule 9(b), such as (1) Mr. Siegel's knowledge that Old Globecon did not suffer substantially from the attacks of September 11, 2001 and being told as such by Old Globecon's former principal shareholder; and (2) the amount by which Mr. Siegel inflated Old Globecon's insurance claims against Hartford.

[16] The Hobbs Act criminalizes conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose…" 18 U.S.C. § 1951. "The term

Hobbs Act, there must be a showing that "(1) the defendant committed 'robbery or extortion' or attempted or conspired to do so, and (2) that the conduct 'obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce.'" United States v. Walker, 657 F.3d 160, 178-79 (3d Cir. 2011) (quoting 18 U.S.C. § 1951(a)). "The Hobbs Act defines the term 'commerce' broadly to include 'all . . . commerce over which the United States has jurisdiction." Id. at 179 (quoting 18 U.S.C. § 1951(b)(3)); see also Stirone v. United States, 361 U.S. 212, 215 (1960) ("[The Hobbs Act] speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.").

Mr. Siegel attempted to extort money from Mr. Desmond through fear. Specifically, On June 15, 2010, Mr. Siegel sent a letter on Globecon letterhead from New Jersey to Mr. Desmond in Ireland stating that one of Mr. Desmond's companies stole intellectual property from Globecon and that "while I am not a speck as successful or powerful as you, I wager I am certainly one of the most tenacious people you would ever meet. Thus, my character requires me to achieve a just resolution on my own terms if I do not hear from you further." (Amend. Compl. ¶ 35; Rosen Cert., Ex. C.) In a July 2, 2010 letter to Mr. Desmond, Mr. Siegel wrote: "when the facts of your financial rape and copyright theft are in the open there will be little denying it . . . light will truly be the best disinfectant," and "[i]f you cannot gather the courage to act like a man then you will do as you want, as will we." (Amend. Compl. ¶ 37; Rosen Cert., Ex. F.)

Defendants argue that these statements merely amount to a business dispute between Mr. Siegel and Mr. Desmond, for which Mr. Siegel was seeking a just resolution. While Mr. Siegel's letters stated that he sought to "resolve . . . [the] unfortunate situation[] in a reasonable manner"

---

'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id.

(Rosen Cert., Ex. C), and that he "look[ed] forward to a fair commercial arrangement to resolve this matter" (Rosen Cert., Ex. D), such statements are not inconsistent with an act of attempted extortion.  Indeed, they serve to encourage Mr. Desmond to compensate Mr. Siegel for the alleged theft of intellectual property under threat of being subject to public allegations of "financial rape and copyright theft" and a "a just resolution on [Mr. Siegel's] own terms." Further supporting an inference of attempted extortion is the fact that Mr. Siegel followed through on these threats by creating meetdermotdesmond.com, which, as discussed above, contained statements suggesting that Mr. Desmond was a thief who associated with criminals.

These allegations also satisfy the elements of attempted extortion, criminal coercion, and impersonation under New Jersey State Law.  See N.J.S.A. 2C:20-5(c) (extortion) ("A person is guilty of theft by extortion if he purposely and unlawfully obtains property of another by . . . . Expos[ing] or publiciz[ing] any secret or any asserted fact, whether true or false, tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute"); N.J.S.A. 2C:13-5 (criminal coercion) ("A person is guilty of criminal coercion if, with purpose unlawfully to restrict another's freedom of action to engage or refrain from engaging in conduct, he threatens to . . . [a]ccuse anyone of an offense . . . [e]xpose any secret which would tend to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute"); N.J.S.A. 2C: 21-17(a)(4) (impersonation) ("A person is guilty of an offense if the person . . . [o]btains any personal identifying information pertaining to another person and uses that information, or assists another person in using the information, in order to assume the identity of or represent himself as another person, without that person's authorization and with the purpose to fraudulently obtain or attempt to obtain a benefit or services . . .").

Thus, the Amended Complaint sufficiently sets forth sufficient predicate acts of racketeering activity under the federal and New Jersey RICO statutes.

       b.  <u>Pattern</u>

Under federal RICO, "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." <u>H.J., Inc.</u>, 492 U.S. at 239 (emphasis in original). "Relatedness" can be established through evidence that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." <u>Id.</u> at 240 (quoting 18 U.S.C. § 3575(e)).

"Continuity" is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." <u>Id.</u> at 241. "Closed-ended continuity" can be shown "by proving a series of related predicates extending over a substantial period of time." <u>Id.</u> at 242. "Open-ended continuity," however, "depends on whether the *threat* of continuity is demonstrated." <u>Id.</u> (emphasis in original). "Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case." <u>Id.</u> For example, Open-ended continuity may be satisfied "where it is shown that the predicates are a regular way . . . of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" <u>Id.</u> at 243. "For analytic purposes these two constituents of RICO's pattern requirement must be stated separately, though in practice their proof will often overlap." <u>Id.</u> at 239.

Under New Jersey RICO, as previously mentioned, the "pattern" element of a pattern of racketeering activity requires "[a] showing that the incidents of racketeering activity embrace

criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J.S.A. 2C:41-1d.

Here, the alleged predicate acts of mail fraud, attempted extortion, criminal coercion, and impersonation are related in that they were perpetrated by Mr. Siegel and involved a misrepresentation—whether an inflated insurance claim, forged signature, unfounded allegation of theft, or false suggestion of criminal behavior—for the purpose of extracting money or a concession from, or intimidating another party.[17]  Similarly, these acts exhibit open-ended continuity because they show Mr. Siegel's regular way of participating in the Starweaver-Globecon Enterprise.  Thus, the Amended Complaint has established a pattern of racketeering activity under both federal and New RICO statutes.

## III.  CONCLUSION

For the foregoing reasons, Magistrate Judge Shipp's January 31, 2012 Order granting Plaintiff's Motion to Amend the Complaint is AFFIRMED.

The Court will enter an order implementing this opinion.


  **/s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated: August 6, 2012

---

[17] The relationship between Mr. Siegel's forgeries of former Globecon employees' signatures in litigation and his impersonation of Mr. Desmond through meetdermotdesmond.com and dermotdesmond666@gmail.com is particularly acute. Those acts involve Mr. Siegel engaging in fictitious representations on behalf an individual in order to extract concessions from that same individual.